# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| SOCIAL COASTER, INC. d/b/a BVIRAL | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | NO. 3:26-cv-00480 |
| ANN UPTON, an individual, | ) ) | JUDGE CAMPBELL |
| Respondent. | ) ) | |

## <u>MEMORANDUM AND ORDER</u>

Pending before the Court is Respondent Ann Upton's motion to dismiss for lack of subject matter jurisdiction, which is fully briefed. (Doc. No. 14, 18, 19). For the reasons stated herein, the motion is **GRANTED**.

## I.     BACKGROUND

In October 2019, Ann Upton and Social Coaster d/b/a BVIRAL ("BVIRAL") entered into a Licensing Agreement that gave BVIRAL rights to two short videos created by Upton. The licensing agreement included an arbitration provision. In 2025, BVIRAL accused Upton of violating the Licensing Agreement's confidentiality clause and initiated an arbitration against her. On April 11, 2026, the arbitrator issued an award denying BVIRAL's claim, declaring the Licensing Agreement "void and unenforceable," and awarding Upton $35,000 in fees under the contract's fee-shifting provision. (*See* Award, Doc. No. 14-1).

On April 17, 2026, BVIRAL filed this lawsuit to vacate the arbitration award. (Doc. No. 1). Upton argues the court lacks subject matter jurisdiction because there is less than $75,000 in controversy and there is no other basis for jurisdiction.

## II. STANDARD OF REVIEW

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Whether a court has subject-matter jurisdiction is a "threshold determination" in any action. *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007).

"A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright*, 751 F.3d at 759. A facial attack challenges the sufficiency of the pleading and, like a motion under Rule 12(b)(6), requires the Court to take all factual allegations in the pleading as true. *Wayside Church*, 847 F.3d at 816–17 (quoting *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)). A factual attack challenges the allegations supporting jurisdiction, raising "a factual controversy requiring the district court to 'weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Id*. at 817 (quoting *Gentek Bldg. Prods., Inc.*, 491 F.3d at 330). Respondent asserts a factual attack on the Court's subject matter jurisdiction.

## III. ANALYSIS

### A. Subject Matter Jurisdiction

In the Petition, BVIRAL asserts the Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) based on diversity of the parties and an amount in controversy over $75,000, and under 28 U.S.C. §§ 1331 and 1338 because the dispute between the parties arises under the Copyright Act. (Doc. No. 1).

2

Even if the underlying arbitration dispute for breach of the confidentiality provision in the Licensing Agreement arose under a federal statute, the Court could not have subject matter jurisdiction on that basis. In *Badgerow v. Walters*, 596 U.S. 1 (2022), the Supreme Court held that a district court may not "look through" to the underlying cause of action in the arbitration for a basis of subject matter jurisdiction. *Id*. at 12. Accordingly, even if the arbitration claims were under the Copyright Act, those claims cannot serve as the basis for jurisdiction over the petition to vacate the arbitration award. BVIRAL does not dispute this conclusion in its response. (*See* Doc. No. 18 at 5 ("After *Badgerow* [], jurisdiction over an application under the Federal Arbitration Act is assessed from the face of the application itself, under ordinary diversity jurisdiction principles.").

A district court may exercise diversity jurisdiction only if the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. *Durant v. Servicemaster Co.*, 109 F. App'x 27, 29 (6th Cir. 2004) (citing 28 U.S.C. § 1332). "The party seeking the federal forum bears the burden of proving that the amount in controversy exceeds $75,000." *Id*. A case should not be dismissed unless it appears to be a "legal certainty that the claim is really for less than the jurisdictional amount." *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 628 (6th Cir. 2009). Here, the parties are completely diverse; the dispute lies with the amount in controversy.

The amount in controversy is generally determined from the complaint itself. *Ford v. Hamilton Investments, Inc.*, 29 F.3d 255, 260 (6th Cir. 1994) (citing *Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 353 (1961). "In actions seeking declaratory or injunctive relief it is well established that the amount in controversy is measured by the value of the object of the litigation." *Sherwood v. Microsoft Corp.*, 91 F. Supp. 2d 1196, 1202 (M.D. Tenn. 2000) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)). When a motion seeks to vacate an arbitration award of a specified dollar amount, that amount is the amount in controversy for

purposes of diversity jurisdiction. *Ford*, 29 F.3d at 260; *Hale v. Morgan Stanley Smith Barney LLC*, 982 F.3d 996 (6th Cir. 2020) (amount in controversy is determined by the relief sought in the petition). When, as here, the motion also seeks to vacate the arbitrator's decision to void the License Agreement, the value of the license agreement contributes to the amount in controversy.

Upton argues BVIRAL's petition fails to meet the amount in controversy requirement. The arbitration award of $35,000 plus costs is well south of the $75,000 threshold, and Upton argues the value of the equitable relief awarded – having the licensing agreement set aside as unenforceable – is of negligible value. Upton recognizes that, in some circumstances it might be difficult to calculate the value of intellectual property rights, but that it is not difficult to do so here because she has never been paid anything by BVIRAL for licensing her videos and BVIRAL has earned, at most, a "negligible" amount of money from her videos. (Upton Aff., ¶ 7; Burdon Dep.,. Doc. No. 10-5 at PageID# 119-20 (BVIRAL CEO Jonathan Burden testifying that BVIRAL made a "negligible" amount from Upton's videos – "somewhere between zero and one thousand [dollars]").

In its response BVIRAL does not dispute that it has earned a "negligible" amount from the License Agreement to date. It argues, however, that the value of the License Agreement should not be measured on its past income. It contends the License Agreement has "significant current value" because the two videos are part of BVIRAL's catalog of nearly 100,000 videos for which it sells subscriptions for $372,000 per year. (Doc. No. 18 at 9 (citing Burdon Decl., ¶¶ 5-6, and Exs. B and D)). BVIRAL asserts that this "catalog-level market pricing" forecloses Respondent's contention that the rights at issue are, to a legal certainty, valued at less than $40,000.

In addition, BIVIRAL argues that part of the value of the License Agreement is that it provides "exclusive-licensee enforcement standing." (*See* Doc. No. 18 at 10). This is of particular

4

importance to BVIRAL because it is pursuing claims a third-party under 17 U.S.C. § 501 (copyright infringement) and 17 U.S.C. § 512(f) (material misrepresentation in a Digital Millenium Copyright Act counternotice) is a separate action also pending before this Court. BVIRAL argues that attorneys' fees incurred in connection with litigation to enforce its rights under the License Agreement are evidence of the value of the License Agreement itself. (*Id*.). Even so, BVIRAL concedes that the damages related to the video at issue in the other litigation are "probably negligible" and that the litigation "has never been about making money … It's been about standing up for our rights … and to keep people from exploiting the counter-notice process." (Burden Dep., Doc. No. 18-5 at PageID# 225). The value of the litigation appears to be solely in the time invested, not the License Agreement.

BVIRAL has not met its burden to show that the amount in controversy is met here. The parties agree that no more than negligible amounts have been earned under the License Agreement, and although BVIRAL argues that historic revenue is not a predictor of future value, it does not point to any evidence to show that revenue is projected to increase in the future. The inclusion of the two videos in BVIRAL's catalogue of over 100,000, for which it charges a significant subscription fee, does not suggest that the two videos themselves are valued at any particular amount. Certainly they should not receive the same valuation as the entire catalogue.

Finally, BVIRAL has not identified any authority that supports its claim that the fees accrued in a separate litigation to enforce rights that it concedes are "not about making money," but to "to keep people from exploiting the counter-notice process" with regard to its catalogue of works, is an appropriate basis for valuation of the License Agreement. To conclude otherwise would essentially allow parties to manufacture standing in one litigation by driving up litigation costs in another. The Court is unaware of any precedent that would support this outcome.

BVIRAL's reliance on *Buck v. Gallagher*, 307 U.S. 95, 102-03 (1939) and *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 347 (1977) does not persuade the Court otherwise. In those cases, the Supreme Court held that in a lawsuit challenging enforcement of a regulatory statute, the amount in controversy includes the cost of compliance with the statute or the losses that will follow from the statute's enforcement. *Buck*, 307 U.S. at 102-03; *Hunt*, 432 U.S. at 347. Neither of these cases suggest that the amount in controversy in one case can be a basis for meeting the jurisdictional threshold in another case or that the value of an object of litigation can be based on the costs of litigation. This is particularly true here, where BVIRAL concedes that the damages related to the licensed content are "negligible."

Having considered the evidence and argument presented, it appears to a legal certainty that the amount in controversy is less than $75,000.

Given that Respondent raises a factual attack, that evidence of the value the object of litigation is largely in the possession of the Petitioner, and that Petitioner does not identify what additional facts would be found if discovery were permitted, the Court is not persuaded that jurisdictional discovery or amendment of the petition would alter this result. Accordingly, Petitioner's request for jurisdictional discovery or amendment of the petition in lieu of dismissal is denied.

**B.      Attorney's Fees**

Finally, Respondent argues that if the motion to dismiss is granted, she is entitled to an award of costs and attorney's fees under either the License Agreement or the Tennessee Revised Uniform Arbitration Act. (Doc. No. 14 at 14-15).

The Tennessee Revised Uniform Arbitration Act ("TRUAA") provides that "[o]n application of a prevailing party to a contested judicial proceeding under [Tenn. Code Ann.] § 29-

6

5-323, § 29-5-323, § 29-5-325, the court may add reasonable attorney's fees and other reasonable expenses of litigation incurred in a judicial proceeding after the award is made to a judgment confirming, vacating without directing a rehearing, modifying, or correcting an award." Tenn. Code Ann. § 29-5-326(c).

Section 7 of the License Agreement provides:

> In the event of any action, suit, or proceeding arising from or based upon this Agreement brought by either party hereto against the other, the prevailing party shall be entitled to recover from the other its attorneys' fees reasonably incurred in connection therewith in addition to the costs of that action, suit, or proceeding.

(Doc. No. 1-1).

BVIRAL argues the attorney's fees provision in the TRUAA does not apply here because dismissal for lack of subject matter jurisdiction is not a judgment "confirming, vacating, modifying, or correcting an [arbitration] award." (Doc. No. 18 at 15). With regard to the fee shifting provision of the License Agreement, BVIRAL argues that if subject matter jurisdiction is lacking, the Court has no jurisdiction to adjudicate a contractual fee claim and that Respondent cannot seek attorney's fees pursuant to a contract she contends is "void and unenforceable." (Doc. No. 18 at 16).

Respondent makes a compelling case for an award of fees. After a heavy-handed campaign of harassment detailed in Respondent's Affidavit (Doc. No. 15), Respondent was unwillingly dragged into arbitration and federal litigation where she prevailed on both fronts. Nevertheless, the Court agrees that the prerequisites for an award of attorney's fees under TRUAA are not met here; and given the absence of subject matter jurisdiction, the Court is not persuaded it has the authority to award contract-based attorney's fees.

If Respondent prevails in a state-court action concerning the arbitration award, the Court believes Respondent may be justified in including any attorney's fees incurred in this case in a petition for fees under Tenn. Code Ann. § 29-5-326(c).

### IV.    CONCLUSION

For the reasons stated herein, the motion to dismiss (Doc. No. 14) is **GRANTED** and the petition is **DISMISSED WITHOUT PREJUDICE** for want of subject matter jurisdiction. Respondent's request for an award of attorney's fees is **DENIED**.

It is so **ORDERED**.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

8